## NEYLAND v. BRAMMER.
### No. 9890.

Court of Civil Appeals of Texas. Galveston.
Nov. 8, 1933.

Rehearing Granted June 6, 1934.

Appellant's Rehearing Denied July 12, 1934.

Appellee's Second Motion for Rehearing
Denied Aug. 4, 1934.

Andrews, Streetman, Logue & Mobley, of Houston, Linebaugh & Guittard and C. C. Carsner, all of Victoria, for appellant.

Campbell, Myer & Myer, of Houston, for appellee.

GRAVES, Justice.

Appellant sued the appellee for the value of 400 shares of common and 90 shares of preferred stock in the Saxet Company, alleged to have belonged to him and to have been converted by her to her own benefit on

or about the 1st day of June, 1928, to his total damage in at least the sum of $10,650, with interest thereon from that date at the rate of 6 per cent. per annum.

The trial court, after hearing the evidence without a jury's aid, denied any recovery on the claim, and filed its findings of fact and law in support of a judgment in favor of the appellee. The appeal challenges the correctness of that determination.

Since the opposing litigants on the one hand mutually vouch for the fact findings, save only the single one fixing the value of the Saxet Company stock, and on the other base their differing contentions here solely on the conclusions of law, the appellant attacking and the appellee defending them in toto, both sorts are now set out in full, as follows:

"Findings of Fact.

"In 1924 J. L. Brammer and H. S. Wilder formed a partnership for the purpose of carrying on a general contracting business, conducting such business as partners up to the time of the death of Brammer, February 5, 1928, with offices at Houston, Texas.

"During the late summer or early fall of 1927, said partnership of Brammer and Wilder, composed of J. L. Brammer and H. S. Wilder, knowing of a small gravel pit at Victoria, Texas, decided to investigate and if found desirable, to purchase and develop certain territory in that vicinity as a sand and gravel proposition for their own purposes and for commercial purposes.

"With this end in view, at this time they employed the plaintiff, O. L. Neyland, to locate such sand and gravel deposits upon the original four league grant to the town of Victoria, west of the Guadelupe River, and to develop the same, agreeing to give him $400.00 per month and 10% interest in the profits of such business, as compensation for his services.

"Such contract of employment did not include an interest in the land or in the business of Brammer and Wilder, his employment being simply that of an agent to locate, bargain for, and develop the gravel properties under the supervision of the firm; all contracts for the purchase and lease of all the gravel lands being required to be submitted to Brammer and Wilder for their approval before execution.

"I further find that during the month of November, 1927, Brammer and Wilder, determining among themselves that the expense of purchasing and developing the sand and gravel properties was too large an undertaking financially for them to handle alone, acting for themselves, entered into an agreement with Pearson and Company, composed of W. L. Pearson and Sam R. Merrill, whereby it was agreed that they should pool interests in respect to the sand and gravel properties situated at Victoria, and further develop and explore the same; that eventually they would form a corporation for the purpose of taking over their joint interests in the sand and gravel business; that each firm would contribute a like amount for the acquisition and development of these sand and gravel deposits and that when the corporation was formed, the stock in the corporation would be issued to and divided equally among the four persons composing the two partnerships.

"That prior to the death of J. L. Brammer, and after the two firms had decided to pool their interests and incorporate the sand and gravel properties, Brammer and H. S. Wilder agreed with the plaintiff, O. L. Neyland, that in lieu of the share in the profits of the business which he was to receive as compensation for his services in the operation of the sand and gravel properties under their management, that they would give him 10% of the stock of the sand and gravel corporation thereafter to be formed, which would be issued to them under the pooling of interests of the two firms. This, at the time mentioned, was arranged for by mutual agreement between the two said firms. Also it was agreed at the same time that Pearson and Company would give A. A. Sangster 10% of their stock in the corporation to be formed.

"That at the time this arrangement was made, the firm of Pearson and Company contributed the services of their superintendent, Sangster, to aid and assist in the development and exploration of the sand and gravel field and that he rendered services along these lines in conjunction with the plaintiff, O. L. Neyland.

"At the time of the death of Brammer, Feb. 5, 1928, all of the properties they then desired for the purpose of the sand and gravel business had been purchased or leased. These lands consisted of three tracts, one lease Oct. 29, '27, for 3-½¢ per square yard, to pay at least $50.00 per month; one lease Nov. 29, '27, for 3-½¢ per square yard as used, and one tract purchased Dec. 27, '27, for $6,107.20 cash; these three tracts aggregating 172 acres.

"Shortly prior to the death of Brammer, a meeting was held at the office of W. H. Ran-

kin, in Houston, Texas, with Brammer, Wilder, Pearson and Merrill present, and after full discussion, they decided to carry out the incorporation and further development of the properties as soon as a satisfactory contract for sand and gravel as ballast, which was then pending with the St. Louis, Brownville and Mexico Railroad, could be consummated.

"That after Brammer's death and before the formation of any of the corporations hereinafter mentioned, the two firms—H. S. Wilder representing the Brammer and Wilder firm—decided to acquire additional gravel properties, and on the 23rd day of February, 1928, acquired by purchase one tract, paying therefor $1595.00, and assuming other debts on the property, and an option and lease on another tract, running three years without cash payment, both tracts aggregating 183.52 acres, titles taken in the name of H. S. Wilder.

"That after the formation of all of the corporations hereinafter referred to, there were six other tracts of gravel land leased or purchased for the enterprise, aggregating 400.10 acres, for which there was paid in cash $30,210.75; the title to five of which—aggregating 299.21 acres—was taken in the name of O. L. Neyland, four of which were taken on May 15, 1928, and one on May 19, 1928; the sixth one, for 100.89 acres, being conveyed directly to the Saxet Sand & Gravel Company under date of May 17, 1928.

"O. L. Neyland, after the death of Brammer, continued his activities in behalf of the sand and gravel venture of the two firms until all of the properties acquired after Brammer's death, above enumerated, had been purchased and conveyed to the Saxet Sand & Gravel Company.

"That the ten tracts referred to above are the same ten tracts referred to in all of plaintiff's petitions, as the ones he purchased for Brammer and Wilder, and in which he (plaintiff) claimed an interest for services rendered in that behalf.

"That at the time of the death of Brammer, the negotiations for the sale of ballast to the railroad were still pending.

"At about April 4, 1928, after the death of Brammer, his wife, Mrs. Mary Louise Brammer, who was left as sole devisee under his will, and who qualified as executrix thereunder, joined with Pearson, Merrill and Wilder in carrying out the plans to incorporate said gravel properties by forming and chartering a corporation under the name of the Gulf Gravel Company.

"That after the purchase of the properties above mentioned, there had been spent in the acquisition and exploration in excess of $40,000.00, and upon the formation of the said corporation, organized by the respective parties to take over the gravel properties, there was $40,000.00 worth of stock issued, $10,000.00 of which was issued to the defendant, Mrs. Brammer, $10,000.00 to Wilder, and $10,000.00 each to Pearson and Merrill, this stock being issued on the 16th day of April, 1928.

"That after the issuance of this stock, the name of the Gulf Gravel Company was changed to the Saxet Sand & Gravel Company, and on the 18th day of May, 1928, the Gulf Gravel Company stock of the defendant was taken up and a certificate of stock of the Saxet Sand & Gravel Company, of that date, for $10,000.00 was issued to her in lieu of the certificate surrendered.

"That on the 1st day of May, 1928, Mrs. Brammer transferred the $10,000.00 worth of Gulf Gravel Company stock issued to her to the Saxet Company in exchange for 900 shares of Preferred Stock and 4000 shares of common stock in the latter company.

"That Mrs. Brammer had no knowledge prior to the issuance of the stock of The Saxet Company to her, in exchange for her stock in the Gulf Gravel Company and the Saxet Sand & Gravel Company, that the plaintiff, O. L. Neyland, claimed or had any interest whatever in the gravel properties, or in the stock of The Saxet Company issued to her in lieu thereof, and that plaintiff made no demands on her at any time prior to the institution of this suit for any interest in the properties or stock of any of said corporations.

"That after her husband's death, February 5, 1928, Mrs. Brammer had no participation in the management of the gravel properties, except to join in the application for the charter for the Gulf Gravel Company and to join in the conveyance of title to properties standing in the name of Brammer and Wilder to the Saxet Sand & Gravel Company, in the conveyance of title to properties standing in the name of Brammer and Wilder to the Saxet Sand & Gravel Company.

"That Mrs. Brammer did not in any way participate in the purchase or lease of the sand and gravel properties acquired after her husband's death, nor did she know at the time of joining with Pearson, Merrill and Wilder, in the forming of the Gulf Gravel Company, when the properties which went into the formation of the corporation were acquired.

"I further find that the cost and expense of the purchase and exploration of the lands acquired after the death of Brammer were in-

cluded in the $40,000.00 expenses, referred to above, for which stock was issued to Pearson, Merrill, Wilder and Mrs. Brammer, on the formation of the Gulf Gravel Company.

"That Mrs. Brammer is still in possession of the Saxet Company stock issued to her in exchange for her stock in the Saxet Sand & Gravel Co., Gulf Gravel Company, and that she claims to own in her own right, title to all of said stock and denies that plaintiff has any interest therein—and I further find in this connection that she has never paid to plaintiff, Neyland, anything of value therefor.

"I find that the reasonable value of the 900 shares of Preferred stock, and the 4000 shares of Common stock in the Saxet Company received by Mrs. Brammer in exchange for the Saxet Sand & Gravel Co., and Gulf Gravel Company stock is $1,000.00.

## "Conclusions of Law.

"Under the allegations in plaintiff's petition, the agreement upon which plaintiff bases his suit having been made with J. L. Brammer and H. S. Wilder prior to Brammer's death, and the great bulk of the services claimed to have been rendered after the death of Brammer, which occurred on February 5, 1928, and defendant, Mary Louise Brammer, never having agreed with plaintiff for the continuation of his services, and never having had any knowledge or notice of plaintiff's claim of an interest in the sand and gravel business or in the stock of the Gulf Gravel Company, or the Saxet Sand & Gravel Company, or The Saxet Company, and plaintiff's suit not being based upon quantum meruit, plaintiff has wholly failed to establish in himself any title to the stock of the Gulf Gravel Company, the Saxet Sand & Gravel Company, or The Saxet Company, and the law of the case is therefore with the defendant, and judgment should be and is here entered in her favor in this case. To which findings of fact and each of them and conclusions of law and each of them, plaintiff in open court excepted.

"Chas. E. Ashe, Judge."

This court, adopting the findings below, except the one touching the value of the Saxet stock, sustains appellant's positions that:

(1) He conclusively showed himself to be the owner, under the terms of his original contract of late 1927 or early 1928 with J. L. Brammer for 10 per cent. of the latter's interest in a holding corporation to be thereafter created for their joint sand and gravel business at Victoria, Tex., with the consideration therefor by him fully paid, of $1,000 of stock in the Gulf Gravel Company (or the Saxet Sand and Gravel Company, into which its name was subsequently changed), and of 490 combined shares in the Saxet Company, which $1,000 interest in the first-mentioned company, after such change of its name, had been received by the appellee as one-tenth part of her deceased husband's interest in such joint enterprise and had been exchanged by her for the 490 shares of Saxet stock on or about June 1 of 1928.

(2) The appellee, in her representative capacity, having on the date last mentioned received and immediately, notwithstanding her knowledge of all the facts giving rise to appellant's ownership thereof, converted to her individual benefit the interest so belonging to him, became in consequence liable in both her capacities to him for its reasonable value as of that date.

(3) The evidence conclusively, if not undisputedly, shows the value of the Saxet 490 shares to have been $10,650 in the aggregate on this date of the conversion thereof.

(4) By the undisputed evidence, inclusive of her own testimony, the appellee, about June 1 of 1928, with such full knowledge of appellant's claim, coincidently not only having received and asserted absolute ownership in herself to all the stock that had so been issued to her for the joint interest of her husband and appellant in the gravel undertaking, but further having likewise appropriated to her own use the whole of the Saxet stock she got in exchange for it, she thereby rendered complete her conversion of appellant's 10 per cent. interest in such receipts and appropriations, and thereafter no demand by him upon her therefor was necessary, since equity does not require a vain or useless thing.

(5) It was unnecessary that the appellee should have agreed with appellant for the continuation of his services, in that her husband, prior to his death, had made a definite and binding contract, according to the terms of which and upon the performance of which appellant was to be entitled to 10 per cent. of the stock of the agreed upon corporation when formed, and, the undisputed evidence having shown a complete performance thereof on the part of appellant, he was thereupon entitled to recover not merely a quantum meruit for services rendered, but the entire value of the stock from her as the representative of, and as a charge against, the estate, which she had received as the sole devisee under her husband's will.

(6) What was done after the death of

J. L. Brammer was in effect the mere carrying out of the executory agreement entered into prior to his death, which performance was shown by the undisputed evidence to have been fully authorized by H. S. Wilder, acting as the surviving partner of the firm of Brammer & Wilder, who had, after the death of Brammer, full power as such surviving partner to execute, perform, and carry out the executory agreement so previously made between Wilder, Brammer, and appellant.

Wherefore, it conclusively appearing in this instance that personal performance by the decedent, J. L. Brammer, of the left-over obligations of his contract with appellant had not been made the essence thereof, the appellee as his executrix was legally bound to perform the same.

If citations of authority be needed in support of any of these conclusions of law, they are here appended seriatim, as above numbered:

(1) The finding of the trial court that the contract for 10 per cent. of the sand and gravel corporation stock to be given appellant was made between him, Brammer, and Wilder appears in paragraph 3 of the findings on page 885 of 73 S.W.(2d), supra. See Wilcox v. Alexander (Tex. Civ. App.) 32 S. W. 561; 24 Corpus Juris, page 53.

■ (2) and (4) The facts recited in these two deductions likewise appear in the quoted findings; it is true the court further found that no demand on the appellee for the stock he claimed was made by appellant before the filing of this suit, but that was unnecessary, since the appellee's pleadings herein not only admitted that no such request would have been complied with, but further denied any right in him, asserted her own exclusive ownership thereof, and declared her purpose to at all times maintain the same. Hence any necessity for a demand had been obviated; the conversion having become complete. 38 Cyc. pp. 2032, 2033, part of par. 3, notes 76 to 84, inclusive; Wagner v. Marple, 10 Tex. Civ. App. 505, 31 S. W. 691; Cronberg Bros. v. Johnson, 29 Wyo. 11, 208 P. 446; Wood v. McDonald, 66 Cal. 546, 6 P. 452; 38 Cyc. 2028, 2029, note 55; Young v. Lewis, 9 Tex. 73, bottom page 77 and top of page 78; Gaw v. Bingham (Tex. Civ. App.) 107 S. W. 931, on page 932 bottom of first column and top of second column; Crawford et al. v. Thomason et al., 53 Tex. Civ. App. 561, 117 S. W. 181, on page 181, bottom of first column.

■ (3) The question as to the value of this stock at a given time was one of fact; the finding of this court upon it being fully sustained by the uncontroverted testimony of the witness Sam R. Merrill. It was otherwise in the same manner shown that the appellee had first denied appellant's interest in this stock and declared her intention of claiming it as her own on the same date to which the value thus placed upon it applied, which was further the lowest value it had until long after this litigation began; wherefore not only may the conversion of it properly be regarded as occurring, but its value also may be fixed as of that date. Crawford et al. v. Thomason, 53 Tex. Civ. App. 561, 117 S. W. 181, on page 183, bottom of first column; 38 Cyc. 2094, note 61; Tucker v. Hamlin, 60 Tex. 171; Grimes v. Watkins, 59 Tex. 133; Empire Transfer & Storage Co. v. Simon (Tex. Civ. App.) 249 S. W. 885, at page 887.

■ (5) and (6) "An executrix is bound by the contract of her decedent, which does not require a personal performance of the decedent. 24 C. J. 53; In re Burke's Estate, 198 Cal. 163, 244 P. 340, 44 A. L. R. 1341; McCann v. Pennie, 100 Cal. 547, 35 P. 158, 159; Allen v. Confederate Pub. Co., 121 Ga. 773, 49 S. E. 782, 783; Miller v. Ready (April 22, 1915) 59 Ind. App. 195, 108 N. E. 605, 608; Campbell v. Faxon, 73 Kan. 675, 85 P. 760, 5 L. R. A. (N. S.) 1002, note; 24 C. J. p. 53, § 472B. Performance of Decedent's Obligations; Wilcox v. Alexander (Tex. Civ. App.) 32 S. W. 561.

■ "A conversion is complete, where the holder of personal property asserts a right inconsistent wtih the title of the owner. Crawford et al. v. Thomason et al., 52 Tex. Civ. App. 561, 171 S. W. 181, on page 183, bottom of first column.

■ "The measure of damages for the conversion of personal property is its value at the date of the conversion. 38 Cyc. 2094, note 61; Tucker v. Hamlin, 60 Tex. 171; Grimes v. Watkins, 59 Tex. 133; Empire Transfer & Storage Co. v. Simon (Tex. Civ. App.) 249 S. W. 885, on page 887."

The facts inhering here and making applicable the several groups of authorities just cited, most of them for the second time, fully appear in the statement of the evidence brought up, if not, indeed, in the official findings of the court; the cause as finally pleaded and tried was clearly not one sounding in quantum meruit as for personal services only partly performed, which, as appellee's brief rightly asserts, was not declared upon, but on the contrary was one upon a definite and

mutually binding contract for the delivery to appellant, on its performance, of 10 per cent. of the stock itself of the gravel corporation when formed; such performance, the great bulk of it during the lifetime of Mr. Brammer himself, and the full remaining complement thereafter in collaboration with his surviving partner, who was not only thereunto duly authorized by law, but who acted in the matter with the appellee's noninterference, the sued upon right to the stock, as against the appellee and the estate she had received in the circumstances stated, became undeniable.

Further discussion is deemed unnecessary, since these conclusions require the vacation of the lower court's decree and the rendition of the cause in appellant's favor for the $10,650, value of the stock as of the 1st day of June of 1928, with 6 per cent. per annum interest thereon from and after that date; it has accordingly been so ordered.

Reversed and rendered.

### On Motion for Rehearing.

PLEASANTS, Chief Justice.

After a re-examination of the record we have reached the conclusion that we erred in our original opinion in holding that judgment should be rendered by this court in favor of the appellant for the sum of $10,650 as the value of the shares of stock belonging to appellant, which we held were converted by the appellee, and which the trial court found was worth only $1,000.

The evidence upon which this court in our original opinion fixed the value of these shares at the time of their conversion was found in the testimony of the witness Merrill. Upon further consideration of this testimony we have concluded that it is too uncertain and speculative to require or authorize the rendition of judgment by this court for appellant for the large amount stated in our original opinion.

This witness testified with perfect candor and his sincerity in so fixing the value of the stock is apparent from the record of his testimony appearing in the statement of facts, but his opinion as to this value was admitted by the witness to have been based largely on hearsay, and the statements of others as to the value of the properties owned by the Saxet Company that issued the shares. Attorneys for the appellee objected to this testimony on these grounds. The testimony was admitted by the court subject to these objections, which were not expressly passed upon. It is manifest, however, from the finding by the court of the value of the shares that the trial judge did not consider the testimony as sufficient to fix their value. The trial court, as set out in our original opinion, found:

"That Mrs. Brammer had no knowledge prior to the issuance of the stock of The Saxet Company to her, in exchange for her stock in the Gulf Gravel Company and the Saxet Sand & Gravel Company, that the plaintiff, O. L. Neyland, claimed or had any interest whatever in the gravel properties, or in the stock of The Saxet Company issued to her in lieu thereof, and that plaintiff made no demands on her at any time prior to the institution of this suit for any interest in the properties or stock of any of said corporations."

This fact finding is supported by the record, and it seems to us acquits appellee of any willful conversion of appellant's stock. She has not disposed of the stock, and only refused to turn it over to him after being told by others of the agreement made by her deceased husband and his partner in acquiring the properties which formed the capital of the corporations thereafter organized, as set out in our original opinion.

In these circumstances, we think the motion for rehearing should be granted, and the cause remanded for a new trial only upon the issue of the value of the stock at the time of the conversion.

Granted.

### On Second Motion for Rehearing.

At a former day of this term we reversed the judgment of the trial court in this case and rendered a judgment in favor of appellant. Appellee in due time filed a motion for rehearing, which was granted by this court in part, and the judgment of rendition theretofore entered was set aside, and the judgment of the trial court reversed and remanded for a new trial on the issue of the amount of damages sustained by appellant.

In due time, appellant filed a motion for rehearing, which was refused by this court on July 12, 1934. In the answer filed by appellee to appellant's motion for a rehearing, she complains of that portion of the judgment granting her first motion for rehearing, restricting a new trial in the court below to the issue of the amount of damages sustained by the appellant, and asks that such portion of our judgment be set aside, and, if the cause reversed, it should be for a new trial on all

of the issues raised by the pleadings and evidence.

There was no indorsement on this answer indicating that it contained any request for affirmative relief, which in effect was a motion for rehearing, and for this reason it was not docketed as a motion for rehearing.

In considering appellant's motion for rehearing, we found no reason for changing our former holding that the case should be reversed on the issue of damages, and therefore did not read appellee's answer to that motion.

Shortly after we ordered appellant's motion for rehearing overruled, appellee's attorney called our attention to the fact that we had not disposed of appellee's motion for rehearing contained in her answer, and requesting us to pass upon that motion.

While we have doubt as to whether we should, under the circumstances above stated, treat the allegations of the appellee's answer as in effect a motion for rehearing, we have decided to give her the benefit of the doubt, and consider her answer as a second motion for rehearing.

We adhere to our holding on appellee's original motion for rehearing that the judgment of the trial court should only be reversed on the issue of damages.

It follows that appellee's second motion for rehearing contained in her answer to appellant's motion for a rehearing, should be overruled, and it has been so ordered.